**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

_____

FREDDIE O. GLOVER, and      )
JULIANA GLOVER,          )
                          )
      **Plaintiffs,**        )
                          )
v.                       )     **No. 07-2808-STA**
                          )
NATIONAL UNION FIRE      )
INSURANCE COMPANY OF   )
PITTSBURGH, PA,         )
                          )
      **Defendant.**        )
_____

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT TO
REVERSE DEFENDANT'S DENIAL OF BENEFITS AND GRANTING DEFENDANT'S
MOTION TO DENY RELIEF AND AFFIRM AND ITS DENIAL OF BENEFITS**
_____

Before the Court are Plaintiffs' Motion for Summary Judgment to Reverse Defendant's

Denial of Benefits (D.E. # 27) filed on September 2, 2008 and Defendant's Motion to Deny

Relief and Affirm its Denial of Benefits (D.E. # 33) filed on October 6, 2008.  Defendant has

filed the administrative record in this ERISA appeal (D.E. # 20, 35).  For the reasons set forth

below, Plaintiffs' Motion is **DENIED** and Defendant's Motion is **GRANTED**.


## BACKGROUND

The administrative record in this matter shows the following: according to a statement

given by Plaintiff Freddie O. Glover ("Plaintiff") to an AIG claims investigator, Plaintiff was

mowing his mother's lawn in mid-April 2005.  Admin. R. GLOVER 0000158.  Plaintiff stepped

1

into a hole while mowing his mother's yard and rolled his ankle.  *Id*.  Plaintiff rated the pain he immediately felt as an 8 on a scale of 1 to 10.  *Id*.  Plaintiff believed that he had suffered an ankle sprain, and so he returned to his home to rest and treat his ankle.  *Id*.  By the end of April 2005, Plaintiff noticed that blisters were starting to form on his ankle.  *Id*.  Plaintiff's foot appeared to turn black, more blisters formed, and then the blisters burst oozing blood.  *Id*.  Plaintiff observed a hole in the center of one the blisters, which emitted a foul odor.  *Id*.  On May 1, 2005, Plaintiff sought medical attention for his foot at Baptist Memorial Hospital in Oxford, Mississippi.  *Id*.[1]

Dr. Earnest B. Lowe ("Dr. Lowe") treated Plaintiff at the hospital and diagnosed him with a gangrenous foot.  *Id*. at 0000111.  Dr. Lowe noted that Plaintiff had been experiencing pain in his foot for about four weeks and that Plaintiff's past medical history was "totally benign" without any indication of diabetes.  *Id*.  When examining Plaintiff's foot, Dr. Lowe observed swelling, several large ulcers, and the smell of rotten flesh.  *Id*.  As a result, Dr. Lowe recommended a below-the-knee amputation and performed the procedure the same day, May 1, 2005.  *Id*. at 0000173-74.

The radiologist report dated May 1, 2005, noted that Plaintiff's right foot showed soft tissue edema, ulceration, and "marked destruction and disruption of" the tarsal bones.  *Id*. at 0000227.  The radiologist opined that "the obvious destructive change and gas seen throughout

---

[1] Defendant cites the claim form where Dr. Lowe indicated that the date of Plaintiff's accident was May 1, 2005.  Def.'s Resp., 5 n.6.  Defendant argues that Plaintiff's wife must have told Dr. Lowe that the injury happened on that date because she completed Plaintiff's medical history upon arrival at the hospital.  However, the medical history form Defendant cites is dated May 18, 2005, and lists Plaintiff's injury as right knee amputation on May 1, 2005.  *Id*. at 0000176-77.  It is clear in context that Dr. Lowe and Plaintiff's wife both referred to May 1, 2005, as the date of injury because that was the date of the amputation, not the date of Plaintiff's alleged ankle sprain.

the tarsal row suggests long standing osteomyelitis and gangrene." *Id*.  Additionally, a post-operative pathology report indicated that Plaintiff's right foot had two necrotic ulcers.  *Id*. at 0000179.  The pathologist's final diagnosis was "gangrene of the foot with necrotizing acute inflammatory changes.  Section of the foot shows osteomyelitis." *Id*.

On May 25, 2005, Plaintiff filed a claim for dismemberment benefits under Fed Ex Corporation's Voluntary Accidental Death and Dismemberment Plan, which is insured by Defendant.  *Id*. at 0000112, 0000332.  Plaintiff has coverage for accidental death and dismemberment through his wife who is an employee of Fed Ex.  *Id*. at 0000318, 0000332. Plaintiff completed a claim form including an explanation of how the accident occurred: "mowing yards and didn't know foot was broke and didn't seek physician until seeing Dr. Lowe." *Id*. at 0000112.  Dr. Lowe completed the section of the claim form titled "Attending Physician's Statement." *Id*.  With respect to the nature of the injury, Dr. Lowe indicated "infection secondary to trauma" on the claim form.  *Id*.

The policy itself states "[i]njury- means bodily injury (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under this Policy is in force; and (2) which directly (independent of sickness, disease or any other cause) causes a covered loss." *Id*. at 0000366.[2]  Furthermore, the dismemberment section states: "Accidental Dismemberment Benefit.  If injury to the Insured Person results, within 365 days of the date of the accident that caused the injury, in any one of

---

[2] Plaintiff quotes the policy's former definition of "injury" which read "[i]njury- means bodily injury caused by an accident occurring while this Policy is in force as to the person whose injury is the basis of the claim and resulting directly and independently of all other causes in a covered loss." *Id*. at 0000332.  The amended definition took effect on January 1, 2003. *Id*. at 0000366.

the losses specified below, the Company will pay the percentage of the Principle Sum shown below for that loss . . . One Hand or Foot . . . 50%." *Id.* at 0000334. The policy provides exclusions for infections: "[t]his policy does not cover any loss in whole or in part by, or resulting in whole or in part from, the following . . . sickness, disease or infections of any kind; except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning." *Id.* at 0000335.

With respect to the claims procedure, the policy states, "Payment of Claims. . . . Upon receipt of due written proof of loss, payments for all losses, except loss of life, will be made to (or on behalf of, if applicable) the Insured Person suffering the loss." *Id.* at 0000336. The policy adds the following concerning written proof of loss: "[n]o action at law or in equity may be brought to recover on this Policy prior to the expiration of 60 days after written proof of loss has been furnished in accordance with the requirements of this Policy." *Id.* at 0000337.

The policy further provides for Defendant's examination of the insured as part of the claims process: "[t]he Company at its own expense has the right and opportunity to examine the person of any individual whose loss is the basis of claim under this Policy when and as often as it may reasonably require during the pendency of the claim." *Id.* According to Defendant, AIG Claims Services was the claims administrator for Defendant National Union. Def.'s Resp., 5 n.5. During the review of Plaintiff's claim for dismemberment, Defendant had three physicians review Plaintiff's medical records. Admin. R. GLOVER 0000145. The first physician to review Plaintiff's medical records, Dr. Gerald Moczynski ("Dr. Moczynski"), concluded that the medical records did not refer to any bodily injury to necessitate the amputation of Plaintiff's foot. *Id.* at 0000150. Dr. Moczynski noted that Plaintiff was seen at the hospital on May 1,

2005, but had experienced problems with his foot for about four weeks.  *Id*. at 0000149.  The
hospital x-rays taken on May 1, 2005 indicated "destructive changes of the tarsal bones
consistent with long standing osteomyelitis and gangrene."  *Id*.  The culture of the abscess was
positive for bacteria.  *Id*.  Dr. Moczynski commented that he could not "confirm on a medical
record review that this patient sustained any bodily injury" such as the fall and ankle sprain
Plaintiff claims to have suffered several weeks prior to the amputation.  *Id*. at 0000150.  Instead
Dr. Moczynski opined that the "destructive changes of his foot. . . are consistent with a
significant infection of the foot and not specific trauma."  *Id*. at 0000149.

Based on Dr. Moczynski's review, Defendant determined that Plaintiff's injury was not
covered.  *Id*. at 0000145.  However, Defendant requested that a specialist in infectious diseases
review Plaintiff's medical records and offer a second opinion.  *Id*.  That specialist was Dr. Peter
McKellar ("Dr. McKellar").  *Id*. at 0000139.  Dr. McKellar observed that Plaintiff "apparently
twisted his ankle during the middle of April 2005 while mowing (sic) lawn.  Over the ensuing
two weeks, his right leg became gangrenous and needed amputation."  *Id*.  The records
repeatedly mentioned that Plaintiff's foot infection had been ongoing for approximately four
weeks prior to his arrival at the hospital.  *Id*.  Dr. McKellar summarized Plaintiff's condition and
treatment at the hospital in May 2005.  *Id*.  Dr. McKellar wrote, "One wonders how did this all
happen?  Why did he not come in earlier?  What is clear is that it did not begin in mid April,
2005.  The changes are too dramatic and extensive to be those of a 2-3 week foot infection that
was totally ignored at home."  *Id*.  While admitting that he did "not have sufficient data on this
patient," Dr. McKellar speculated that Plaintiff might have metabolic syndrome, a precursor of
type 2 diabetes.  *Id*.  From his review of Plaintiff's medical records, Dr. McKellar drew the

following conclusions:

> 1) This amputation was not the result of a twisted ankle or fracture two weeks prior to 5/1/05.  The amputation was more likely related to an injury considerably earlier in time which was ignored for some reason by the patient.

> 2) I do not know what caused the initial injury here.  Two sizeable ulcerations on his foot did not just pop up from a twist or a fracture of the foot two weeks prior.

> 3) Amputation was required to control the multi-organism infection in his foot.  I did not see evidence of clostridial infection which might have been even more rapid in onset. Because there were multiple organisms involved, I suspect that he had an initial wound which was ignored and allowed to become extensively infected over time.

*Id*. at 0000140.

In a letter dated January 11, 2006, Defendant denied Plaintiff's claim for benefits under the accidental dismemberment policy.  *Id*. at 0000137.  Defendant wrote that there was no evidence in the administrative record that the amputation of Plaintiff's foot was caused by a bodily injury sustained as a result of an accident external to the body.  *Id*.  Defendant concluded that "the loss of your foot was caused in whole or in part by, or resulting in whole or in part from to (sic) long standing osteomyelitis, a disease."  *Id*.

On June 22, 2006, Plaintiff gave Defendant notice through counsel of his intention to appeal Defendant's denial of his claim.  *Id*. at 0000103.  During the appeal process, Defendant obtained a brief opinion from Dr. Lowe, Plaintiff's treating physician at the hospital.  *Id*. at 000085.  Defendant provided the conclusions of Drs. Moczynski and McKellar and asked Dr. Lowe to respond to their opinions.  *Id*.  On July 27, 2006, Dr. Lowe briefly answered, "By history he was asymptomatic prior to his twisting injury.  He had been at home for several weeks and I still have no idea why (sic) became gangrenous so easily."  *Id*.

Pending the appeal, Defendant obtained a third peer review of Plaintiff's medical records

from Dr. Christine Zurawski ("Dr. Zurawski"), an infectious diseases specialist.  *Id*. at 000014.
In response to the question of whether Plaintiff's injury was a bodily injury as defined in the
policy, Dr. Zurawski briefly opined that "the medical record does not provide any information
regarding how long ulcers or infection had been present nor their cause."  *Id*.  Dr. Zurawski
added that an infection of this type "had not likely been present long."  *Id*.  As far as the cause of
the amputation, Dr. Zurawski stated that "there is nothing in the record stating that there is an
accident of some kind."  *Id*.  Finally, Dr. Zurawski opined, "There is no way this medical record
can be used to determine anything definatively (sic).  It is completely devoid of historical
information."  *Id*.

At a meeting on December 13, 2006, the AIG Appeals Committee ("the Committee")
upheld the denial of benefits.  *Id*. at 000020.  The Committee relied on Dr. Zurawski's evaluation
and concluded that Plaintiff had failed to show that his loss was caused by an injury as defined in
the policy.  *Id*. at 000021.

In his Motion for Summary Judgment, Plaintiff argues that the Court should review
Defendant's denial of benefits under a de novo standard.  Plaintiff's accidental death and
dismemberment policy does not grant Defendant discretionary decision-making authority in
granting or denying claims.  Plaintiff contends that the policy does not contain a clear grant of
discretion to Defendant.  Furthermore, the "written proof of loss" language found in the policy
does not constitute discretionary authority.  With respect to Plaintiff's claim, Plaintiff states that
he has shown that his injury is covered under the terms of the policy.  More specifically, Plaintiff
argues that the record supports his contention that he suffered an external bodily injury which
resulted in the amputation of his right foot.  In addition to Plaintiff's own assertion that he

injured his ankle while mowing grass, Dr. Lowe indicated on the claim form that Plaintiff's

injury was "infection secondary to trauma." As Plaintiff's treating physician and the only

physician to have conducted a physical examination of Plaintiff in this case, Dr. Lowe's opinion

is entitled to greater weight.[3] Plaintiff also argues that the precise timing of the accident is

irrelevant because it could not have occurred more than 365 days prior to the date of loss, May 1,

2005. The policy requires that a covered injury must "result[], within 365 days of the date of the

accident that caused the injury." According to Plaintiff, osteomyelitis, the condition diagnosed

in his gangrenous foot, is by definition "usually acute, running a severe but limited course."[4]

Therefore, the date of the injury itself could not have occurred outside of the coverage period

under the terms of the policy.

Plaintiff goes on to argue that the physicians who reviewed Plaintiff's medical records as

part of the claims process could not rule out Dr. Lowe's diagnosis of "infection secondary to

trauma." With respect to both peer reviews, Plaintiff emphasizes that Defendant could have had

both physicians physically examine Plaintiff but chose not to do so. In his report, Dr. Moczynski

only concluded that the medical records could not confirm that Plaintiff had suffered a bodily

injury. Nor could Dr. Moczynski explain the source of the infection in Plaintiff's foot.

Similarly, Plaintiff argues that Dr. McKellar's review also supports his claim that he injured his

foot and that the foot later became infected and gangrenous. According to Plaintiff, Dr.

McKellar only opined that the injury could not have happened only two to three weeks prior to

---

[3] Plaintiff also addressed Defendant's contention that Dr. Lowe reported the date of
Plaintiff's injury as May 1, 2005. The Court has already considered this issue. *See* note 1.

[4] J.E. Schmidt, M.D., *Attorney's Dictionary of Medicine and Word Finder* O-119 (1997).

the amputation as Plaintiff claims.  Dr. McKellar admitted that he could not determine what caused the initial injury but theorized that there was an initial wound which was ignored and became seriously infected.  Plaintiff does not dispute that he had osteomyelitis and gangrene in his right foot.  Plaintiff contends that these conditions developed as a result of the external injury he suffered when he sprained his ankle/broke his foot.

Plaintiff also attacks the implication in Defendant's letter denying benefits that Plaintiff had type II diabetes or its precursor.  Plaintiff points out that his medical records repeatedly state that he does not have diabetes.  Moreover, Defendant had the opportunity to have Plaintiff tested during the review process but instead relied on physicians located in Arizona to hypothesize that Plaintiff might, in fact, have diabetes.  Plaintiff argues that Defendant bears the burden to show that an exclusion to the policy should apply.  Here Defendant claims that the infection in Plaintiff's foot was caused by osteomyelitis.  Defendant ignores the fact that osteomyelitis is a bacterial infection, which according to Plaintiff was caused by external trauma.  Thus, Plaintiff's injury should have been covered under the terms of the policy.  Plaintiff next argues that Defendant failed to properly investigate his claim and that neither of Defendant's physician peer reviewers could refute Dr. Lowe's diagnosis that Plaintiff's foot was infected secondary to trauma.

Finally, Plaintiff argues that the Court should find in his favor even if the Court applied the abuse of discretion standard to Defendant's denial of his claim.  Plaintiff emphasizes that the precise timing of his injury is irrelevant because osteomyelitis is by definition acute.  More importantly, there is no medical evidence to refute Plaintiff's contention that the infection resulted from an injury that occurred within 365 days of the date of his amputation.  Therefore,

Plaintiff seeks a reversal of Defendant's denial of benefits.

Defendant has opposed Plaintiff's Motion and filed its own Motion to Deny Relief and Affirm Its Denial of Benefits. As an initial matter, Defendant argues that the arbitrary and capricious standard should apply. The plan in this case vested discretionary authority in the administrator because the plan required submission of "due written proof" of Plaintiff's loss. Under the arbitrary and capricious standard, Defendant need only establish that its decision to deny benefits was rational. According to Defendant, Plaintiff failed to carry his burden to show that his claim came within the terms of the policy. Neither Plaintiff's records nor Dr. Lowe's statement show that the injury was the result of an accident. There is no medical opinion in the administrative record linking Plaintiff's April 2005 injury to the May 1, 2005 amputation of his foot. Defendant properly obtained independent medical review of Plaintiff's records. Those physicians determined that there was no support for Plaintiff's claim that the amputation was necessitated by an injury as defined in the policy. It was undisputed that Plaintiff had had his infected foot amputated. Thus, there was no reason to have the physicians examine Plaintiff in person. More importantly, Defendant argues that all three physicians who reviewed Plaintiff's records concluded that the records did not establish how long the infection was present, the records did not show that there was an accident, and the records could not be used to determine anything definitively. Therefore, Plaintiff could not bear his burden to show that the mid-April 2005 injury was the cause of the bacterial infection in his right foot.

Additionally, Defendant contends that Plaintiff cannot avail himself of the exception to the exclusion in the policy. More specifically, Plaintiff failed to prove that he suffered a "bacterial infection due to an accidental cut or wound." Even if Plaintiff did suffer an ankle

sprain in April 2005, there is no evidence that his injury included a "cut" or "wound" as those terms are understood in their ordinary usage.

Defendant argues that it adequately investigated Plaintiff's claim prior to denying benefits.  First, Defendant sent a representative to interview Plaintiff about his injury.  Defendant then had Plaintiff's medical records reviewed by two different physicians.  After Plaintiff's appeal, Defendant went on to obtain additional information from Dr. Lowe, whose response Defendant characterizes as "obtuse."  Defendant submitted the records to a third physician for peer review.  At that point, the Appeals Committee affirmed the denial of Plaintiff's claims.  As a result, Plaintiff's argument that Defendant did not adequately investigate his claim is baseless.

Plaintiff has supplemented his Motion in which Plaintiff reiterates many of the same arguments offered in his initial Motion.[5]  Likewise, Defendant has filed a response to Plaintiff's supplement.  Plaintiff has also filed a reply brief.


**<u>STANDARD OF REVIEW</u>**

A denial of benefits will be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[6]  The Supreme Court has held that without an express delegation of discretion to a plan administrator, a court should review a benefit determination de novo.[7]  On the other hand, when a plan expressly grants the plan administrator discretion to

---

[5] *See* Order Denying Plaintiff's Motion for Sanctions (D.E. #43), May 28, 2009.

[6] *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

[7] *Id.* at 115, 109 S.Ct. 948.

make benefits determinations, the court should review the determination under an arbitrary and capricious standard.[8]  The Court must closely examine the specific language of the plan in order to determine whether the plan grants discretionary authority.  In this Circuit, no "magic words" or "incantation" of the phrase "discretionary authority" is required to find that the plan vests discretion in the plan administrator.[9]  On the contrary, the *Firestone* court has stated that the focus should be on the plan fiduciary's "authority to determine eligibility for benefits or to construe the terms of the plan."[10]  While a formulaic recitation is not required to vest discretion, the plan must contain "a clear grant of discretion [to the administrator] to determine benefits or interpret the plan."*[11]*

In the case before the Court, the relevant language in the policy appears to be found in two sections.  Under the section titled "Proof of Loss," the policy states, "Written proof of loss must be furnished to the Company within 90 days after the date of loss."  The policy goes on to provide in its "Payment of Claims" section that "Upon receipt of due written proof of loss, payments for all losses, except loss of life, will be made to (or on behalf of, if applicable) the Insured Person suffering the loss."  The Sixth Circuit held in *Hoover v. Provident Life* that the phrase "written proof of loss" standing alone is not enough to indicate a grant of discretionary authority to a plan administrator.[12]  The *Hoover* court concluded that a disability insurance

---

[8] *Id.* at 110-12, 109 S.Ct. 948.

[9] *Perez v. Aetna Life Ins. Co.,* 150 F.3d 550, 557 (6th Cir.1998); *Hoover v. Provident Life Ins. Co.,* 290 F.3d 801, 808 (6th Cir.2002).

[10] *Perez,* 150 F.3d at 557 (quoting *Firestone,* 489 U.S. at 115, 109 S.Ct. 948).

[11] *Id.*

[12] *Hoover*, 290 F.3d at 808.

policy used the phrase "written proof of loss" with reference to proof of loss of income, not proof of a disability.[13]  Therefore, the policy did not contain a clear grant of discretion to the plan administrator, and the de novo standard of review applied.  On the other hand, the Sixth Circuit held in *Perez v. Aetna Life Insurance* that a plan requiring "satisfactory evidence" of a claim was sufficient to grant discretion.  The *Perez* court identified the following provision as "the locus of any discretion" in the plan in question: "[Aetna] shall have the right to require as part of the proof of claim satisfactory evidence. . . that [the claimant] has furnished all required proofs for such benefits. . . ."[14]  Based on the requirement that the evidence be "satisfactory," the Sixth Circuit concluded that the plan in *Perez* had vested the plan administrator with discretionary authority to determine whether proof of loss was satisfactory, and so the arbitrary and capricious standard of review applied.[15]

The plan at issue in the case at bar refers to "due written proof of loss."  The Sixth Circuit has not directly addressed whether this specific formulation amounts to a grant of discretion.  However, in *Perez* the Sixth Circuit cited examples of plan language which other courts had interpreted as a grant of discretion.  In a string citation of ten cases, the Sixth Circuit quoted a Seventh Circuit case in which that court held that the phrase "due proof" vested discretion in the plan administrator.[16]  The Sixth Circuit did not adopt that holding specifically and did not rely on

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Perez*, 150 F.3d at 555-56 (citing *Patterson v. Caterpillar, Inc.*, 70 F.3d 503, 505 (7th Cir. 1995) (The plan language in *Patterson* stated "benefits will be payable only upon receipt by the Insurance Carrier or Company of such notice and such due proof, as shall be from time to

it any way in reaching its determination in the *Perez* case.  The *Perez* court did find that cite the phrase "due proof" as an example of a phrase similar to the phrase "satisfactory evidence."  The *Perez* court went on to hold that the "satisfactory evidence" phrase clearly vested discretionary authority with the plan administrator.

Even though the Sixth Circuit did not explicitly hold that the phrase "due proof" is a grant of discretion, the Court holds that under *Perez* the phrase "due written proof" amounts to a grant of discretion.  First, the *Perez* court identified "due proof" as an example of plan language similar to "satisfactory evidence," a phrase which the Court held was a clear grant of discretion. By extension then, there is reason to think that the Sixth Circuit would also conclude that "due proof" or "due written proof" indicate a grant of discretion.  Second, other courts in the Sixth Circuit, including two unpublished decisions of the Court of Appeals itself, have relied on *Perez* for the proposition that the phrases "due proof" or "due written proof" amount to a grant of discretion to a plan administrator.[17]  It is true that the Seventh Circuit abrogated the case law on which its holding about the "due proof" language rested.[18]  However, the *Patterson* case remains

_____

time required, of such disability.")).

    [17] *E.g., Fendler v. CNA Group Life Assur. Co.*, 247 Fed. Appx. 754, 758-59 (6th Cir. 2007) (unpublished) *Leeal v. Cont'l Cas. Co.,* 17 Fed. Appx. 341, 343 (6th Cir.2001) (unpublished); *Schornhorst v. Ford Motor Co.*, 606 F. Supp. 2d 658, 665 (E.D. Mich. 2009); *Carpenter v. CNA, Continental Cas. Co.*, 254 F. Supp. 2d 730, 738 (S.D. Ohio 2002).  *But see Perrin v. Hartford Life Ins. Co.*, 616 F. Supp. 2d 652, 659 (E.D. Ky. 2007) ("it is evident from the context of this language that the word 'due' refers only to the timeliness of the written proof"); *Napier v. Hartford Life Ins. Co.*, 282 F. Supp. 2d 531, 534 (E.D. Ky. 2003).

    [18] *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 640 (7th Cir. 2005), disapproving *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375 (7th Cir. 1994), *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043 (7th Cir. 1989). ("To the extent that the test applied in *Donato* and *Bali* is inconsistent with the approach we are now articulating, we hereby disapprove the former two cases. . . [b]ecause we are changing the way in which we ascertain the

good law in the Seventh Circuit.  More importantly, there is no indication that the Sixth Circuit

would no longer view "due proof" plan language as being similar to the phrase "satisfactory

evidence."  Therefore, the Court holds that the "due written proof" language in the plan at issue

here is a grant of discretion, and so the arbitrary and capricious standard of review should apply.


The arbitrary and capricious standard is the "least demanding form of judicial review."[19]

Under this standard, a decision is not arbitrary and capricious as long as "it is possible to offer a

reasoned explanation, based on the evidence, for a particular outcome."[20]  "When applying the

arbitrary and capricious standard, the Court must decide whether the plan administrator's

decision was 'rational in light of the plan's provisions.'"[21] A plan administrator's decision will

be upheld if the decision "is the result of a deliberate, principled reasoning process and if it is

supported by substantial evidence."[22]  However, review under this deferential standard is not

"without some teeth.  Deferential review is not no review, and deference need not be abject."[23]

## ANALYSIS

---

proper standard of review.").  The Court observes that in addition to *Patterson*, the Sixth Circuit in *Perez* cited *Donato* and *Bali* as well.  However, neither *Donato* nor *Bali* involved plan language using the phrase "due proof."

[19] *Davis v. Ky. Fin. Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir. 1989).

[20] *Id.*

[21] *Williams v. Int'l Paper Co.*, 227 706, 712 (6th Cir. 2000) (quoting *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988)).

[22] *Elliott v. Metro. Life. Ins. Co.,* 473 F.3d 613, 617 (6th Cir. 2006).

[23] *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir.2003).

The Court holds that Defendant's denial of Plaintiff's claim for accidental dismemberment benefits was not arbitrary and capricious.  Defendant denied Plaintiff's claim because there was no evidence in the administrative record that the amputation of Plaintiff's foot was caused by a bodily injury sustained as a result of an accident external to the body.  Rather Defendant relied on the peer reviews of Plaintiff's medical records to conclude that "the loss of your foot was caused in whole or in part by, or resulting in whole or in part from to (sic) long standing osteomyelitis, a disease."

A plaintiff bears the burden in an ERISA benefits case to present evidence to show that he or she is entitled to benefits under the terms of the plan.[24]  Conversely, a plan-defendant bears the burden to show that an exclusion under an ERISA plan should apply.[25]  Federal common law rules of contract interpretation govern the interpretation of ERISA plans to determine whether a loss is covered under a policy.[26]  The general principles of contract law require the Court to interpret the provisions of an ERISA-governed insurance policy according to the plain meaning of the plan language in an ordinary and popular sense.[27]  The policy at issue covers injuries that result from an accident as long as the accident occurred within 365 days prior to the injury.  The

---

[24] *E.g. Rose v. Hartford Financial Services Group, Inc.*, 268 Fed. Appx. 444, 452 (6th Cir. 2008); *Tracy v. Pharmacia & Upjohn Absence Payment Plan*, 195 Fed. Appx. 511, 516 n. 4 (6th Cir. 2006).  Unpublished decisions in the Sixth Circuit are not binding precedent.  *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996) (holding that unpublished opinions "carry no precedential weight [and] ... have no binding effect on anyone other than the parties to the action").  Their reasoning may be "instructive" or helpful.  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 593 (6th Cir. 2004).

[25] *E.g. Caffey v. Unum Life Ins. Co. of America*, 1997 WL 49128, *3 (6th Cir. Feb. 3, 1997) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir.1992)).

[26] *See Perez,* 150 F.3d at 556.

[27] *Id.*

plan defines an injury as "bodily injury (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under this Policy is in force; and (2) which directly (independent of sickness, disease or any other cause) causes a covered loss." Bacterial infections are specifically excluded under the terms of the policy except such infections arising from an accidental cut or wound. Therefore, Plaintiff bears the burden to show that he suffered a bodily injury sustained as a direct result of an unintended, unanticipated accident that is external to the body.

The Court finds that Defendant's denial was not arbitrary and capricious in this case. For his part, Plaintiff bore the burden to present evidence that he suffered a covered injury. However, the Court holds that Plaintiff failed to meet his burden. The administrative record contains little or no evidence that Plaintiff was injured as the result of an accident. Plaintiff's original claim form included the following brief statement as to the nature of the accident: "mowing yards and didn't know foot was broke and didn't seek physician until seeing Dr. Lowe." The attending physician, Dr. Lowe, indicated on the claim form that the nature of the injury was "infection secondary to trauma." There is nothing in the record to show that Dr. Lowe had personal knowledge of the alleged accident. Presumably Dr. Lowe relied on Plaintiff's self-report about twisting his ankle and referred to that reported injury as "trauma" on the claim form. There was no other evidence in the record that Plaintiff had indeed sustained a bodily injury as a direct result of an unintended, unanticipated accident that is external to the body.

Despite Plaintiff's failure to present any other evidence of an accident, Defendant nevertheless sent an investigator to interview Plaintiff about the accident and the nature of his

17

injury.  Plaintiff told the investigator that he was mowing his mother's yard when he stepped into a hole and apparently sprained his ankle.  Plaintiff did not seek medical attention at that time and could not even establish an exact date of the accident.  Plaintiff averred that the accident occurred no more than a two or three weeks prior to the amputation of his foot.  However, every physician who reviewed Plaintiff's medical records concluded that there was no medical evidence of an accident or injury which could explain the bacterial infection in Plaintiff's foot.  The first reviewing physician Dr. Moczynski stated that he saw no evidence that Plaintiff had suffered a bodily injury.  Instead Dr. Moczynski observed that the "destructive changes of his foot. . . are consistent with a significant infection."  Likewise Dr. McKellar, the second physician to review Plaintiff's records, opined that the ulcers on Plaintiff's foot "did not just pop up from a twist or a fracture of the foot two weeks prior."  Dr. McKellar went on to speculate that Plaintiff "had an initial wound which was ignored and allowed to become extensively infected over time." During Plaintiff's administrative appeal, a third physician Dr. Zurawski found that "there is nothing in the record stating that there is an accident of some kind" and "the medical record does not provide any information regarding how long ulcers or infection had been present nor their cause."  All of the physicians agreed that Plaintiff had had a serious bacterial infection in his foot and that the records submitted offered no explanation of causation.  Even the treating physician Dr. Lowe admitted "I still have no idea why [Plaintiff's foot] became gangrenous so easily."  In short, Plaintiff's only evidence of an accident was his own statement that he was hurt while mowing grass.  Therefore, it was not arbitrary and capricious for Defendant to disregard Plaintiff's version of events without further corroborating proof of an accident.[28]

---

[28] *Rose*, 268 Fed. Appx. at 452.

Based on the dearth of evidence of an accident, the Court holds that Defendant's denial of the claim was not arbitrary and capricious. For its part, Defendant did not make its decision hastily and did not prevent Plaintiff from presenting evidence in support of his claim.[29] Plaintiff filed his timely claim for benefits on May 25, 2005. Defendant promptly sent an investigator to interview Plaintiff and to obtain Plaintiff's medical records. After obtaining two independent reviews of the records, Defendant denied Plaintiff's claim on January 11, 2006. Furthermore, after Plaintiff appealed the denial, Defendant gave Plaintiff's treating physician an opportunity to review and comment on the opinions of the peer review physicians. Defendant then solicited a third independent medical review of Plaintiff's records. On December 13, 2006, Defendant's appeals committee upheld the denial of Plaintiff's appeal. The Court finds that Defendant's denial was not hastily made and Plaintiff had ample opportunity to present evidence.

Moreover, the Court finds that Defendant's decision in this case was the result of a deliberate, principled reasoning process. More specifically, Defendant had three different independent physicians review the records and make a medical determination about Plaintiff's injury. Even after the first physician found that there was no medical evidence to support Plaintiff's version of events, Defendant obtained a second opinion. The second physician's conclusions were consistent with the first physician's, namely, that Plaintiff's foot could not have become infected and gangrenous from a sprained ankle in only two or three weeks. During the appeal, Defendant took the step of obtaining a third peer review in which the third physician opined that such an infection could develop quickly but that there was no evidence in the records to suggest that Plaintiff had been in an accident or suffered from an injury as defined in the

---

[29] *See Fox v. Jewish Hosp., Inc.*, 1993 WL 483216, *2 (6th Cir. Nov. 22, 1993).

policy.

Based on the fact that Defendant sought file reviews from three independent physicians, the Court is satisfied that the review process in this case was deliberate and thorough.  While Defendant did not have a physician conduct a physical examination of Plaintiff, a plan administrator is not barred from utilizing a file review in lieu of a physical examination.[30]  It is, however, true that in some cases the plan administrator's "failure to conduct a physical examination-especially where the right to do so is specifically reserved in the plan-may raise questions about the thoroughness and accuracy of the benefits determination."[31]  The Court finds that this is not one of those cases.[32]  Defendant's reliance on three non-treating, non-examining physicians was also reasonable because the plan administrator did not totally ignore the opinions of Plaintiff's treating physician.[33]  Defendant received Dr. Lowe's statement in Plaintiff's initial claim form and then gave Dr. Lowe the opportunity to respond to the opinions of the two peer review physicians.  Dr. Lowe initially indicated on the claim form that Plaintiff's injury was an

---

[30] *Calvert v. Firstar Fin. Inc.,* 409 F.3d 286, 296 (6th Cir. 2005) (finding "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination.").

[31] *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (citations omitted).

[32] This principle has been applied most frequently in the context of long- and short-term disability benefits determinations.  *E.g. Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547, 554 (6th Cir. 2008); *Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 167 (6th Cir. 2007); *Smith v. Cont'l Cas. Co.,* 450 F.3d 253, 263 (6th Cir. 2006); *Evans v. UnumProvident Corp.,* 434 F.3d 866, 877 (6th Cir. 2006); *Calvert,* 409 F.3d at 295.  Plaintiff's argument that Defendant could have tested Plaintiff for diabetes is without merit.  It is clear from Defendant's denial letter that it did not conclude that Plaintiff had diabetes.  *See* Admin. R. GLOVER 0000137.

[33] *Helfman*, 573 F.3d at 393 (citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003)).

"infection secondary to trauma" and later referred to Plaintiff's "twisting injury."  However, there is no evidence that Dr.  Lowe had personal knowledge of an accident, i.e. the "trauma."  More importantly, Dr. Lowe later stated in response to the peer reviews that he had "no idea why [Plaintiff's right foot] became gangrenous so easily."  In effect, Dr. Lowe offered no medical opinion on causation, the central issue in the plan's determination and in this appeal.  Thus, there is no evidence that Defendant disregarded any of Dr. Lowe's opinions.  Therefore, the Court concludes that Defendant's denial of benefits was the result of a deliberate, principled reasoning process.

Finally, Defendant's decision is supported by substantial evidence, that is, Defendant had a reasoned explanation for its denial grounded in the evidence available.  As discussed *supra*, Plaintiff had the burden to adduce evidence to show that he had suffered a covered injury and failed to make that showing.  At the same time, the record shows that there was substantial evidence of a serious bacterial infection but no evidence to explain what caused the infection. The policy excluded coverage for loss of limb resulting from a bacterial infection unless the infection was caused by an accidental cut or wound.  Based on the initial review of Plaintiff's claim including two physician peer reviews, Defendant determined that "the loss of [Plaintiff's] foot was caused in whole or in part by, or resulting in whole or in part from to (sic) long standing osteomyelitis, a disease."  Both the radiology and pathology reports conducted at the hospital noted conditions in Plaintiff's foot consistent with "longstanding osteomyelitis and gangrene." There was no dispute from the physician peer reviews that Plaintiff's foot showed signs of osteomyelitis and that the attendant infection was not as recent as two or three weeks prior to the amputation, as Plaintiff claimed.  Although the peer reviews were unable to explain the origin of

the osteomyelitis, they agreed that the records contained no evidence of an accident and otherwise failed to establish the cause of the infection.  Furthermore, the physicians agreed that the infection had not developed in short span of time.  A third peer review concurred that there was not enough information from which any conclusions could be drawn about the origin of the infection in Plaintiff's foot.[34]  Therefore, the Court holds that Defendant had a reasoned basis for rejecting Plaintiff's unsupported contention that the infection had developed after he stepped into a hole and injured his ankle in April 2005.

Plaintiff has argued in the alternative that other evidence would show that even if the injury had occurred earlier than April 2005, it still would be covered under the terms of the plan. First, Plaintiff argues that the exact date of his accident is irrelevant because he need only show that the accident occurred within 365 days prior to the amputation in order to come within the terms of the plan.  Additionally, Plaintiff admits that his infection was consistent with osteomyelitis.  Yet Plaintiff goes on to state that by definition osteomyelitis is "usually acute, running a severe but limited course."  As a result, the onset of the osteomyelitis must also have occurred within 365 days prior to the amputation.  From these premises Plaintiff argues that the injury speaks for itself and was covered under the terms of the policy.

The Court finds this argument unpersuasive.  Even if Plaintiff's osteomyelitis had been present only for a short time, there was still no evidence from the record to show that Plaintiff had been in an accident or what had caused the osteomyelitis.  As a matter of law, Plaintiff had

---

[34] It is true that the third physician's opinion differed slightly from that of the first two physicians in that the third physician opined without elaboration that such an infection "had not likely been present long."  However, the third physician agreed with the others that there was nothing in the record to show what caused the infection.

the burden to establish that he had suffered an injury as defined in the policy. However, there is no medical evidence in the record that Plaintiff's infection could only have resulted from an accident including an accidental cut or wound. The opinions from each of the physicians illustrate this problem. Of the four physicians who had knowledge of Plaintiff's medical records, three concluded that they had no explanation for his bacterial infection. The other physician speculated that Plaintiff may have had metabolic syndrome, a precursor to diabetes, or that Plaintiff may have allowed a wound to become infected. Thus, Plaintiff's contention that the infection could only occur as a result of an accident such as an ankle injury or a cut or wound is not supported in the record.

## CONCLUSION

The Court concludes that Defendant's denial of Plaintiff's claim was not arbitrary and capricious. Therefore, the decision of the plan administrator is **AFFIRMED** and Plaintiff's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

s/ **S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: September 28th, 2009.